UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NANCY LUDWIG, *on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.

FCA US LLC,

Defendant.

Civil Action No. 24-8906 (RK) (RLS)

**OPINION**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon a Motion to Dismiss the First Amended Complaint ("AC"; ECF No. 35) filed by Defendant FCA US LLC ("FCA" or "Defendant"). (ECF No. 43.) Defendant seeks to dismiss Lead Plaintiff Nancy Ludwig and each other named Plaintiff (collectively "Plaintiffs"). Defendant filed a brief in support of its Motion ("MTD," ECF No. 43-1), Plaintiffs filed a brief in opposition ("Opp," ECF No. 44), and Defendant filed a reply brief (ECF No. 45). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

**I.    BACKGROUND**

    The Court takes all the allegations in the First Amended Complaint (the "AC" or "Amended Complaint") as true for the purposes of this Motion to Dismiss.[1] The Amended

---

[1] While a court must accept as true all allegations in the plaintiff's complaint, and view them in the light most favorable to the plaintiff, *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), a court is not required to accept sweeping legal conclusions cast in the form of factual allegations, unwarranted

Complaint contains exclusively state law claims under state implied warranty of merchantability laws as well as fraud-based claims under state consumer protection acts and state common law. Nine Plaintiffs from eight different states bring a putative class action against FCA for claims arising from an alleged power steering defect (the "Defect") in some of its pickup trucks. (AC ¶¶ 1–2.) Plaintiffs are current and former owners and lessees of 2013 to 2024 Dodge Ram 1500 pickup trucks (the "Class Vehicles"). (*Id.* ¶ 1.) The Amended Complaint sets forth causes of actions on behalf of the individual Plaintiffs and on behalf of a putative nationwide class and sub-classes. (*Id.* ¶ 144.) Defendant FCA is a Michigan limited liability company with its principal place of business in Michigan. (*Id.* ¶ 108.) FCA designs, manufactures, and sells several vehicles under brands such as Chrysler, Jeep, and Dodge, including the Dodge Ram 1500 pickup trucks at issue in this case. (*Id.* ¶¶ 1, 108.)

According to the Amended Complaint, all certified pre-owned FCA Class Vehicles are sold with warranties issued at the time of sale. (*Id.* ¶ 134.) The Class Vehicles contain two different warranties: (a) a 3-month/3,000-mile "maximum care" warranty covering "most of the vehicle's parts" and (b) a 7-year/100,000-mile "limited warranty" covering parts used in the vehicle's powertrain. (*Id.*) Plaintiffs alleges that the warranties were to benefit the "ultimate consumer," rather than the dealer. (*Id.*) The Amended Complaint further states that "[a]s a matter of law, each Class vehicle comes with an implied warranty of merchantability whereby FCA warrants each

---

inferences, or unsupported conclusions. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 & n.8 (3d Cir. 1997).

vehicle to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which it was to be used." (*Id.* ¶ 158.)

Each Class Vehicle is assembled, manufactured, and sold with power steering functionality, which makes driving and steering far easier. (*Id.* ¶¶ 110–11.) This functionality is managed by an electric power steering unit ("EPS Unit"), which employs sensors to calculate how much "assistive torque" is needed to support the driver in making turns. (*Id.* ¶¶ 2, 110.) According to Plaintiffs, while a vehicle is being operated, the EPS Unit sometimes suddenly and without warning malfunction, causing the wheel to immediately stiffen, making turning difficult, and posing a significant safety risk. (*Id.* ¶¶ 2, 113.) Plaintiffs assert that the Defect "exists" dormant in Class Vehicles at the time of purchase, but generally does not surface until after the warranty period has lapsed. (*Id.* ¶ 114.)

FCA is accused of hiding and "concealing" the Defect despite knowledge of same as ostensibly evidenced through thousands of consumer complaints, FCA-issued safety recalls, and a plethora of warranty claims. (*Id.* ¶¶ 2–4, 115–17 (complaints), 118–21 (safety recalls), 122–24 (warranty claims), 129.) Although, according to the AC, Defendants characterized the power steering issue as "isolated" and "limited," Plaintiffs allege that all but a few hundred Ram 1500 trucks from 2016 and 2019 were impacted by the Defect. (*Id.* ¶ 4.) Plaintiffs allege that Defendant declined to make the Defect known because disclosure would have triggered costly repairs, typically around $3,000 to $4,000 per vehicle, for which reimbursements would be demanded. (*Id.* ¶¶ 3–4.)

## A.    PLAINTIFFS

The Amended Complaint consists of individualized allegations as to nine separate named Plaintiffs. Some allegations are common to all Plaintiffs and are recited in rote form as to each: (a) each Plaintiff uses the vehicle for "personal, family and/or household uses" (*id.* ¶¶ 13, 26, 38, 47,

61, 70, 79, 89, 100); (b) safety and reliability were "important factors" in each Plaintiff's decision to purchase the vehicle (*id.* ¶¶ 14, 27, 39, 48, 62, 71, 80, 90, 101); (c) each Plaintiff relied on various advertisements and promotional materials he or she was exposed to regarding the Class Vehicles' quality, reliability, safety, and durability that made no mention of the Defect (*id.* ¶¶ 15, 28, 40, 49, 63, 71, 81, 90, 102, 133); (d) had they known about the Defect, each Plaintiff would not have purchased or leased their vehicles, at least not at the price they paid (*id.* ¶¶ 18, 31, 43, 52, 66, 74, 84, 93, 105); and (e) each Plaintiff alleges their Class Vehicle was defective at the time of sale (*id.* ¶¶ 17, 30, 42, 51, 65, 73, 83, 92, 104). The Court now turns to the allegations unique to each individually named Plaintiff.

### 1.      Nancy Ludwig (New Jersey Plaintiff)

Plaintiff Nancy Ludwig, a resident of Bridgewater, New Jersey, purchased a pre-owned 2016 Ram 1500 from an authorized FCA dealership in Flemington, New Jersey on August 15, 2020. (*Id.* ¶¶ 11, 12.) On the first day of 2024, Ms. Ludwig's domestic partner (and co-owner of her vehicle) experienced the power steering trouble when exiting a drive-through lane at a McDonald's restaurant. (*Id.* ¶ 19.) At this time, the vehicle's steering wheel immediately stiffened and became difficult to turn—nearly causing a collision with two pedestrians. (*Id.*) The issue was diagnosed as a failure in the electric power steering unit, which necessitated its replacement. (*Id.* ¶ 20.) Ms. Ludwig paid $4,484.59 to replace the electric power steering "rack and pinion" on the vehicle. (*Id.* ¶ 23.)

### 2.      Joseph Spillane (New Jersey Plaintiff)

Plaintiff Joseph Spillane, a resident of Toms River, New Jersey, purchased a new 2013 Ram 1500 from an authorized FCA dealership in Little Falls, New Jersey on January 1, 2014. (*Id.* ¶¶ 24, 25.) Around late July or early August 2024, Mr. Spillane received a "Service Power

Steering" warning on his car display. (*Id.* ¶ 32.) After contacting FCA's customer service, FCA declined to cover the cost to remedy his power steering issue. (*Id.* ¶ 33.) Mr. Spillane was notified that the materials to repair the issue were on a national backorder and would cost $2,800 once repaired. (*Id.* ¶¶ 34, 35.)

### 3.    Christopher Martinez (California Plaintiff)

Plaintiff Christopher Martinez, a resident of Upland, New Jersey, purchased a pre-owned 2020 Ram 1500 from an authorized FCA dealership in greater Los Angeles, California on an unspecified date. (*Id.* ¶ 37.) According to the AC, on multiple unspecified dates, Mr. Martinez experienced "heavy steering" and loss of power steering while operating his vehicle. (*Id.* ¶ 44.) When he notified the dealership from which he purchased the vehicle about same, they allegedly "gave him the run around." (*Id.*)

### 4.    Breck Jackson (Florida Plaintiff)

On November 26, 2023, Plaintiff Breck Jackson, a resident of Port Charlotte, Florida, purchased a certified pre-owned 2019 Ram 1500 from an authorized FCA dealership in Orlando Florida. (*Id.* ¶¶ 45, 46.) On an unspecified date, it was "nearly impossible" for Mr. Jackson to turn his vehicle while backing out of his home. (*Id.* ¶ 53.) After the car was ostensibly repaired, the car again suffered a power steering failure. (*Id.* ¶ 57.) In total, Mr. Jackson paid $520 in out-of-pocket expenses to repair the power steering issue. (*Id.* ¶ 58.)

### 5.    Andrew Debruyne (Illinois Plaintiff)

Plaintiff Andrew Debruyne, a resident of Wonder Lake, Illinois, purchased a pre-owned 2016 Ram 1500 from an authorized FCA dealership in Fox Lake, Illinois around April 2018. (*Id.* ¶ 60.) On or about April 4, 2024, Mr. Debruyne's vehicle "lock[ed] up" while he was driving 35 miles per hour on a residential road. (*Id.* ¶ 67.)

### 6.    Gabriel Clinton (Michigan Plaintiff)

Plaintiff Gabriel Clinton, a resident of Fairgrove, Michigan, purchased a certified pre-owned 2019 Ram 1500 from an authorized FCA dealership in Michigan. (*Id.* ¶ 69.) At various unspecified times, Mr. Clinton experienced several instances of power steering failure. (*Id.* ¶ 75.) Mr. Clinton paid approximately $2,200 to get the power steering issue resolved. (*Id.* ¶ 76.)

### 7.    Michael Weldon (Ohio Plaintiff)

Plaintiff Michael Weldon, a resident of Medina, Ohio, purchased a new 2018 Ram 1500 from an authorized FCA dealership in Ohio on an unspecified date. (*Id.* ¶¶ 77, 78.) Mr. Weldon experienced power steering issues on "several occasions." (*Id.* ¶ 85.) He later learned that the vehicle was out of warranty, there was no recall, and that it would cost $5,000 to remediate the power steering problem. (*Id.* ¶ 86.)

### 8.    Jacob Andress (Pennsylvania Plaintiff)

Plaintiff Jacob Andress, a resident of Coatesville, Pennsylvania, purchased a new 2020 Ram 1500 from an authorized FCA dealership in Downingtown, Pennsylvania in March 2021. (*Id.* ¶¶ 87, 88.) Mr. Andress experienced "sporadic[]" power steering failures. (*Id.* ¶ 94.) Following one of the power steering failures in March 2021, Mr. Andress learned that he would not be covered for costs of the repairs and ultimately paid $3,432.38 to resolve the issue. (*Id.* ¶ 95.)

### 9.    Tina Legere (Texas Plaintiff)

Plaintiff Tina Legere, a resident of Bulverde, Texas, purchased a new 2020 Ram 1500 from an authorized FCA dealership in San Antonio, Texas on or about August 27, 2020. (*Id.* ¶¶ 98, 99.) Four years later, Ms. Legere experienced a power steering failure while on a highway. (*Id.* ¶ 106.) Although she was notified that a repair would cost approximately $3,300, Ms. Legere ultimately paid $762.50 for a "lesser repair." (*Id.*) The power steering issues were not resolved, and Ms.

Legere faced "another total loss of steering power" on a highway and narrowly avoided a serious accident. (*Id.* ¶ 107.)

### B.    ALLEGATIONS AS TO FCA'S KNOWLEDGE OF THE DEFECT

#### 1.    Safety Recalls

In August 2015, FCA commenced an investigation into power steering issues in its 2015 and 2016 Ram 1500 trucks. (Compl. ¶ 119.) In light of the investigation's findings, FCA issued a recall for approximately 442 Ram 1500 trucks manufactured between 2015 and 2016, which equated to five percent of the total population of such vehicles. (*Id.* ¶ 118; ECF No. 1-4.)[2] According to the "Part 573 Safety Recall Report," also identified as the National Highway Traffic Safety Administration ("NHTSA") Recall Number 16V-167 submitted on May 10, 2016, the EPS units in the affected vehicles were "contaminat[ed]," which resulted in intermittent or complete loss of power steering assist while driving. (ECF No. 1-4 at 2.) FCA planned to conduct a voluntary safety recall to replace the EPS units on the affected vehicles, *i.e.,* the approximately 442 affected vehicles as defined in the Safety Recall Report. (*Id.* at 3.)

A year later in August 2016, FCA issued a Technical Service Bulletin indicating that vehicles built between March 22, 2016 and April 9, 2016 could have their EPS units replaced free of charge because of a risk of power steering issues. (AC ¶ 120.) Over three years later, in

---

[2] While Plaintiffs state that they have "re-submitted" Exhibit 1 from the original complaint, the Amended Complaint is devoid of any exhibits. (*See* AC ¶ 115 n.3.) Moreover, throughout the AC are references to other exhibits, seemingly attached to the original complaint. (*See, e.g., id.* ¶ 119 n.4, n.5.) However, as an added layer of confusion, the exhibit numbers referenced in the Amended Complaint do not match the numbers of the exhibits attached to the original complaint. (*Compare id.* ¶ 119 n.5 ("Ex. 3, Part 573 Safety Recall Report for NHTSA Recall 16V-167"), *with* ECF No. 1-4 (Exhibit 4: Part 573 Safety Recall Report 16V-167).) In any event, the Court will consider the exhibits attached to the original complaint where relevant and to the extent it can easily identify the intended exhibit. *See, e.g., Pressley v. Exeter Fin. Corp*, No. 21-3641, 2022 WL 2905235, at *2 n.3 (E.D. Pa. July 22, 2022) (collecting cases); *accord Benchoff v. Yale*, 620 F. App'x 114, 116 n.1 (3d Cir. 2015) ("The amended complaint incorporates the exhibits attached to the original complaint.").

November 2019, FCA issued another recall, this time of 2019 Ram 1500s produced between August 26, 2019 and September 28, 2019 for power steering loss stemming from—again—"contamination" of the EPS units. (*Id.* ¶ 121; ECF No. 1-5.) This "Part 573 Safety Recall Report," identified as NHTSA Recall Number 19V-812, is dated November 14, 2019 and covers 193 vehicles. (ECF No. 1-5 at 2.)

The Part 573 Safety Recall Report included a chronology of events leading up to the recall. (*Id.* at 3.) In October 2019, FCA learned about vehicles experiencing intermittent loss of power steering assist. (*Id.*) Within two weeks, they opened an investigation and convened relevant stakeholders to assess the issue. (*Id.*) In early November 2019, FCA learned that there had been "zero [Customer Assistance Inquiry Record]s," five field reports, no accidents, and no injuries pertaining to the issue. (*Id.*) FCA, nevertheless, issued the voluntary safety recall of affected vehicles. (*Id.*)

In all, FCA struggled to fulfill all of the power steering repair requests because the relevant parts for the Class Vehicles were on national backorder and were otherwise hard to obtain. (AC ¶ 124.) At times, it took months for the parts to come in. (*Id.*)

### 2.    National Highway Traffic Safety Administration

The NHTSA, a federal agency that focuses on vehicle safety, receives customer complaints and manages a complaint database that has been active and publicly available since January 2000. (*Id.* ¶¶ 115, 116.) When filing an NHTSA complaint, consumers are asked to provide the make, model, and year of the vehicle as well as details relating to the safety incident. (*Id.* ¶ 116.) At the time the Amended Complaint was filed, there were approximately 1,800 NHTSA complaints referencing power steering loss on Class Vehicles. (*Id.*) Plaintiffs allege that FCA, including its customer relations personnel and quality engineers, "routinely monitors" NHTSA complaints

concerning its vehicles. (*Id.* ¶ 115.) Nearly 80 of the power steering-related complaints involve crashes. (*Id.* ¶ 117.) Included in the AC is a sampling of the power steering-related NHTSA complaints as well as a chart that categorizes the power steering complaints by date of complaint and model year of the vehicle:

| RAM 1500 Power Steering Complaints Submitted to NHTSA SINCE 2013 by Date of Complaint | | RAM 1500 Power Steering Complaints Submitted to NHTSA Since 2013 by Model Year | |
|---|---|---|---|
| Filed In | Complaints | Model Year | Complaints |
| 2014 | 6 | 2013 | 464 |
| 2015 | 30 | 2014 | 373 |
| 2016 | 14 | 2015 | 263 |
| 2017 | 25 | 2016 | 222 |
| 2018 | 73 | 2017 | 139 |
| 2019 | 161 | 2018 | 41 |
| 2020 | 151 | 2019 | 269 |
| 2021 | 156 | 2020 | 38 |
| 2022 | 155 | 2021 | 29 |
| 2023 | 453 | 2022 | 10 |
| 2024 | 600 | 2023 | 7 |
| 2025 | 33 | 2024 | 2 |
| Total | 1857 | Total | 1857 |

(*Id.* at 21.)

In addition to NHTSA complaints, FCA allegedly reviews customer complaints from other sources, including on internet forums, social medial websites, consumer websites, and automotive blogs. (*Id.* ¶ 115.) FCA's customer relations department also receives customer complaints directly. (*Id.*) In addition to the customer relations department, FCA's warranty department allegedly reviews and analyzes warranty data to detect trends relating to defects in their vehicles. (*Id.* ¶¶ 122–24.)

In August 2023, the NHTSA allegedly noticed a "substantial discrepancy" between FCA's narrow recall for power steering loss in the 2016 RAM 1500 and the increasing number of customer complaints about power steering in 2013 to 2016 Ram 1500 vehicles. (*Id.* ¶ 5.)

Apparently in response to this discrepancy, the NHTSA's Office of Defect Investigation ("ODI") opened an investigation into the power steering issues in the 2013 to 2016 Ram 1500 vehicles. (*Id.*) Notwithstanding the investigation, owners and lessees of the Class Vehicles remained unaware of the Defect subjecting them to alleged continued "risk of serious injury." (*Id.* ¶ 6.)

### C. FCA'S ADVERTISING AND MARKETING CAMPAIGNS

Plaintiffs generally allege that Defendant engaged in "pervasive" and "extensive nationwide multimedia advertising campaigns" through internet, print, television, billboards, social media, and other mediums that purportedly "impart a universal and pervasive marketing message: safe and reliable family vehicles." (*Id.* ¶¶ 130, 133.) The Amended Complaint contains one such example of an advertisement that described the Ram 1500 truck as "America's Longest-Lasting Pickups." (*Id.* ¶ 131.) Although a still image—from what appears to be a television commercial— is embedded in the Amended Complaint, there is no information provided as to when this commercial was shown, where it ran, and through what channels. Plaintiffs allege that FCA's advertisements, including this one, failed to disclose the Defect. (*Id.* ¶ 132.)

### D. CLAIMS

Plaintiffs' Amended Complaint contains 26 claims.[3] These claims, brought under state implied warranty of merchantability laws, state consumer protection acts, and state common law, are as follows:

<u>On behalf of the New Jersey Class:</u>
- COUNT II: New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")
- COUNT III: New Jersey Implied Warranty of Merchantability, N.J. Stat. Ann. § 12A:2-314

---

[3] In a letter on February 19, 2025, Plaintiffs agreed to voluntarily dismiss their Magnuson-Moss Warranty Act claim (Count I) and their claim under the California Unfair Competition Law (Count V). (*See* ECF No. 40.)

<u>On behalf of the California Class:</u>

- COUNT IV: California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA")
- COUNT VI: California Implied Warranty Of Merchantability, Cal. Com. Code § 2314
- COUNT VII: Fraud By Concealment under California law

<u>On behalf of the Florida Class:</u>

- COUNT VIII: Florida Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUPTA")
- COUNT IX: Florida Implied Warranty Of Merchantability, Fla. Stat. § 672.314
- COUNT X: Fraud By Concealment under Florida law

<u>On behalf of the Illinois Class:</u>

- COUNT XI: Illinois Consumer Fraud And Deceptive Business Practices Act, Ill. Comp. Stat. 505/1, *et seq.* and 720 Ill. Comp. Stat. 295/1A ("ICFA")
- COUNT XII: Illinois Uniform Deceptive Trade Practices Act, Ill. Comp. Stat. 510/1, *et. seq.* and 720 Ill. Comp. Stat. 295/1A ("UDPTA")
- COUNT XIII: Illinois Implied Warranty Of Merchantability, Ill. Comp. Stat. 5/2-314 and 810 Ill. Comp. Stat. 5/2A-212
- COUNT XIV: Fraudulent Concealment / Fraud By Omission under Illinois law

<u>On behalf of the Michigan Class:</u>

- COUNT XV: Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.* ("MCPA")
- COUNT XVI: Michigan Implied Warranty Of Merchantability, Mich. Comp. Laws § 440.2314

<u>On behalf of the Ohio Class:</u>

- COUNT XVII: Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("CSPA")
- COUNT XVIII: Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.* ("Ohio DTPA")
- COUNT XIX: Ohio Contractual Implied Warranty, Ohio Rev. Code Ann. §§ 1302.27 and 1310.19
- COUNT XX: Ohio Contractual Implied Warranty, Ohio Rev. Code Ann. §§ 1302.27 and 1310.19
- COUNT XXI: Fraud & Fraudulent Concealment under Ohio law

On behalf of the Pennsylvania Class:

- COUNT XXII: Pennsylvania Unfair Trade Practices And Consumer Protection Law, P.S. § 201-1, *et seq*. ("UTPCPL")
- COUNT XXIII: Pennsylvania Implied Warranty Of Merchantability, Pa. Cons. Stat. Ann. § 2314

On behalf of the Texas Class:

- COUNT XXIV: Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, *et seq*. ("Texas DTPA")
- COUNT XXV: Texas Implied Warranty Of Merchantability, Tex. Bus. & Com. Code § 2.314
- COUNT XXVI: Fraud By Concealment under Texas law

In all, Plaintiffs seek, *inter alia*, damages, restitution, injunctive and declaratory relief in the form of court-ordered repairs and recalls as well as extended warranties. (AC at 98–99.)

**E.    PROCEDURAL HISTORY**

On August 30, 2024, Plaintiffs Nancy Ludwig and Joseph Spillane brought an initial complaint with five claims, including one under the Magnusson-Moss Warranty Act, and four under New Jersey statutory and common law. (*See generally* ECF No. 1.) On October 22, 2024, Defendant filed a letter requesting a pre-motion conference in connection with a motion to dismiss. (ECF No. 18.) In response to Defendant's putative arguments, Plaintiffs sought leave to amend their complaint. (ECF No. 27.)

After this Court granted Plaintiffs leave to amend, Plaintiffs filed the now-operative Amended Complaint, which expands the case to 26 different claims on behalf of nine named plaintiffs across eight states. (ECF No. 35.) Again, Defendant sought to dismiss the pleading and outlined its arguments in a pre-conference letter. (ECF No. 38.) After Plaintiffs filed a letter in response (ECF No. 40), the Court authorized the parties' briefing on a motion to dismiss (ECF No. 42). The motion to dismiss was filed on the docket on April 18, 2025, along with the response in opposition, and the reply brief. (*See* ECF Nos. 43, 44, 45.)

## II.    LEGAL STANDARD

### A.    FEDERAL RULE OF CIVIL PROCEDURE RULE 8

Federal Rule of Civil Procedure ("Rule") 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). These are "minimal burdens on the plaintiff" to ensure defendant has "fair notice of what the claim is and the grounds upon which it rests." *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (cleaned up). "[D]etailed factual allegations" are not required but "labels and conclusions" are insufficient. *Phillips*, 515 F.3d at 231 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, plaintiff has an obligation to provide sufficient grounds indicating he is entitled to relief.

### B.    FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

Pursuant to Rule 12, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). In short, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## C.    FEDERAL RULE OF CIVIL PROCEDURE RULE 9(B)

For claims sounding in fraud, the underlying allegations must surpass Rule 8's requirements and instead comport with Rule 9(b)'s heightened pleading standard. *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citations omitted). Although "every material detail" is not required, "precision and some measure of substantiation" is essential for allegations of fraud. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotation marks and citation omitted). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations and quotations omitted).

## III.    **DISCUSSION**

At the outset, the Court notes that Plaintiffs have pled many different claims under a myriad of different state laws, resulting in voluminous briefing from the parties replete with case citations. Yet, the parties give rather cursory attention to many of the claims and issues, often providing no more than a few sentences of argument for each point. As the parties acknowledge, there are often ample cases—most of which are non-binding, unreported, district court cases—that go both ways on any given issue. Here, the Court—as mandated by the United States Court of Appeals for the Third Circuit—follows state law as interpreted by the highest court in each state to the extent such an interpretation is available. *See Moses v. Dist. Att'y Philadelphia*, 133 F.4th 251, 260 (3d Cir.

2025)) ("We are bound to follow state law as announced by the highest court. When a state supreme court has not squarely addressed an issue, we look to all relevant sources of that state's law . . . ." (cleaned up)). Where there is no state supreme court decision on point, the Court has considered intermediate state appellate court decisions, as well as those from federal circuit and district courts. *See id.*

Defendant introduces three primary grounds on which to dismiss the Amended Complaint. *First*, that the Amended Complaint fails under Rules 8 and 12(b)(6) because the existence of a defect is insufficiently pled. *Second*, that the implied warranty claims (Counts III, VI, IX, XIII, XVI, IXX, XX, XXIII, XXV) fail for various state-specific reasons. *Third*, that the fraud-based claims (Counts II, IV, VII, VIII, X, XI, XII, XIV, XV, XVII, XVIII, XXI, XXII, XXIV, XXVI) are insufficient under Rule 9(b) and other state laws.[4]

### A.    THE POWER STEERING DEFECT

All claims in the Amended Complaint are premised on the existence of a defect. Therefore, for any of the claims in the AC to be successful, Plaintiffs must adequately allege the Defect, under the federal pleading standards set forth in Rules 8 and 12(b)(6). Defendant argues that Plaintiffs have failed to properly plead a vehicle defect. (MTD at 20–23.)

To sufficiently establish a vehicle defect, a plaintiff must allege (1) a vehicle's defective part and (2) "examples of how the defect allegedly manifests." *E.g.*, *Rains v. Jaguar Land Rover N. Am., LLC*, No. 22-4370, 2023 WL 6234411, at *5 (D.N.J. Sept. 26, 2023) (first citing *Milisits*

---

[4] Neither side raises any choice-of-law disputes, thus the Court refrains from doing so *sua sponte*. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) (concluding that "parties may waive choice-of-law issues"); *see also Hunsinger v. Valdez*, No. 07-1141, 2009 WL 10716284, at *7 (M.D. Pa. July 20, 2009) (citing *Integral Res. (PVT) Ltd. v. Istil Grp., Inc.*, 155 F. App'x 69, 73 (3d Cir. 2005)) (declining to raise choice of law issue *sua sponte*); *see also Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 528 n.1 (D.N.J. 2001) (same). Here, as the parties do, the Court employs the law of the state under which each claim arises.

*v. FCA US LLC*, 2021 WL 3145704, at *3 (E.D. Mich. July 26, 2021); then citing *Weston v. Subaru of Am., Inc.*, 2022 WL 1718048, at *5 (D.N.J. May 26, 2022)). Pleading the "mechanical details of an alleged defect" is not required, however. *Rains*, 2023 WL 6234411, at *5 (quoting *Milisits*, 2021 WL 3145704, at *3).

Sometimes, in cases involving particularly complex components, courts have applied more stringent pleading requirements—advocated for by Defendants here (*see* MTD at 22)—beyond the abovementioned requirements. *See, e.g., DeCoteau v. FCA US LLC*, No. 15-20, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015) ("[T]he level of specificity required appears to directly correlate to the complexity of the machinery in question."). *DeCoteau*, the case on which Defendant relies for a more stringent standard, stated that "steering defect[s]" involve a "less complex component" of a vehicle, and are therefore *not* subject to any heightened requirement. *Id.* (citing *Aguilar v. Gen. Motors, LLC*, No. 13-437, 2013 WL 5670888, at *7 (E.D. Cal. Oct. 16, 2013) (considering allegations of a defect that, *inter alia*, "results in steering wheel locking, loss of power steering while in motion, [and] steering wheel instability")). Accordingly, the Court is unpersuaded that Plaintiffs must overcome an elevated pleading standard.

Plaintiffs' allegations easily surpass the pleading bar imposed here. The Amended Complaint contains allegations that the Class Vehicles' EPS Unit is defective resulting in sudden loss of power steering. (AC ¶¶ 1–2, 113–14.) Plaintiffs allege that when the Defect manifests, the steering wheel "immediately" stiffens and impedes a driver's ability to turn the vehicle. (*Id.* ¶ 113.) The AC does not—and need not—make in-depth averments about the technical or mechanical flaws of the EPS Unit, *i.e.* what caused the alleged Defect. *See Armstrong v. BMW of N. Am., LLC*, No. 23-3046, 2024 WL 3042822, at *3 (D.N.J. June 18, 2024). As such, the Amended Complaint's identification of the EPS Unit as the source of the Defect and its hazardous effect on steering is

sufficient. Even so, the Recall Notices attached to the AC provide additional details that the EPS control circuit boards were "contaminated" causing them to short circuit. (AC ¶¶ 119, 121; ECF Nos. 1-4, 1-5, 1-6 at 2.) The allegations as to the Defect are sufficient under Rules 8 and 12(b)(6).

## B.    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY CLAIMS

Plaintiffs assert nine counts for breach of the implied warranty of merchantability under the laws of eight states. Plaintiffs allege that FCA provided Plaintiffs and putative class members with an implied warranty of merchantability covering the Class Vehicles and its parts. (*E.g.,* AC ¶¶ 182, 218, 248, 336, 370, 388.) Although the implied warranty ostensibly guaranteed that the Class Vehicles were "fit for the[ir] ordinary purposes," Plaintiffs posit that the vehicles allegedly failed to live up to this promise because the Defect impeded the Class Vehicles from "providing reasonably reliable and safe transportation at the time of sale or thereafter." (*Id.* ¶ 182.)

An implied warranty of merchantability is a creature of state law. As a general matter, the implied warranty of merchantability guarantees, among other things, that consumer goods are "'fit for the ordinary purposes for which such goods are used.'" *Skeen v. BMW of N. Am., LLC*, No. 13-1531, 2014 WL 283628, at *16 (D.N.J. Jan. 24, 2014) (quoting UCC § 2–314(2)(c)). As applied to motor vehicles, it warrants that they "will operate in a safe condition and be substantially free of defects." *Rains*, 2023 WL 6234411, at *13 (quoting *Henderson v. Volvo Cars of North Am., LLC*, No. 09-4146, 2010 WL 2925913, at *9 (D.N.J. July 21, 2010)).

The Court analyzes each implied warranty claim under applicable state law.

### 1.    New Jersey Warranty Claims (Count III)

For the New Jersey Implied Warranty claim, Defendant argues that because the express warranty expired, the implied warranty did too, and therefore Plaintiffs' claims for breach of the implied warranty under New Jersey law must fail. (MTD at 24–26.) Although Plaintiffs do not

dispute that the implied warranty expired, they argue this is of no consequence because the warranty terms are unconscionable. (Opp at 27–30.)

An implied warranty claim under New Jersey law assures that goods "are fit for the ordinary purposes for which such goods are used." N.J. Stat. Ann. 12A:2-314(2)(c). Express and implied warranties are generally "construed as consistent with each other and as cumulative." N.J. Stat. Ann. § 12A:2-317. This has been interpreted to mean that implied warranties "expire upon expiration of any express warranties for that same product." *Paolucci v. FCA US LLC*, No. 23-2982, 2024 WL 3355390, at *3 (D.N.J. July 9, 2024) (citing *N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 329–30 (3d Cir. 2007) (holding implied warranty of merchantability is "displaced" after expiration of express warranty)); *see also Craft v. BMW of N. Am., LLC*, No. 24-6826, 2024 WL 5197080, at *7 (D.N.J. Dec. 23, 2024) (quoting *Nobile v. Ford Motor Co.*, No. 10-1890, 2011 WL 900119, at *4 (D.N.J. Mar. 14, 2011) ("New Jersey's N.J.S.A. 12A:2–317 limits any implied warranty to the terms of an express warranty.")).

Ordinarily, once an implied warranty expires, its coverage ends, even in cases of latent defects, *i.e.*, defects that might be present but do not manifest until later. *See McQueen v. BMW of N. Am., LLC*, No. 12-06674, 2014 WL 656619, at *5 (D.N.J. Feb. 20, 2014) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3d Cir. 1995) (other citation omitted). Because Plaintiffs do not dispute that the New Jersey Implied Warranty claim expired, the Court presumes it did and moves onto Plaintiffs' only asserted basis for survival: allegedly unconscionable warranty terms. *See Skeen*, 2014 WL 283628, at *12–16 ("Where the alleged breach regards a latent defect that manifests outside the period covered by the warranty, a plaintiff may sometimes state a claim if he alleges that the warranty was unconscionable."). However, if a complaint does not properly allege *both* procedurally and substantively unconscionable warranty

terms, then a New Jersey breach of implied warranty claim must be dismissed. *See Pace v. Hamilton Cove*, 317 A.3d 477, 489 (N.J. 2024) (discussing New Jersey's unconscionability doctrine); *Skeen*, 2014 WL 283628, at *14 (indicating that in the vehicle warranty context, "a plaintiff must plead *both* substantive as well as procedural unconscionability" (emphasis added)). Procedural unconscionability pertains to the "unfairness in the formation of the contract" while substantive unconscionability concerns "excessively disproportionate terms." *Weske v. Samsung Elecs. Am., Inc.*, No. 10-4811, 2012 WL 833003, at *6 (D.N.J. Mar. 12, 2012) (citing *Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 921–22 (N.J. Super. Ct. Ch. 2002)).

Plaintiffs fail to maintain the New Jersey Implied Warranty claim because they do not allege any substantive unconscionability.[5] Moreover, Plaintiffs, in their opposition brief, do not argue substantive unconscionability separately from procedural unconscionability. (*See* Opp at 28–29.) Plaintiffs' sole argument is that the warranties were unconscionable because "FCA imposes its express warranties unilaterally and uniformly through its approved dealers," which deprived Plaintiffs of any "meaningful choice in setting the terms" of the warranties. (*See* Opp at 29–30 (citing *Skeen*, 2014 WL 283628, at *14).) Although a lack of "meaningful choice" might satisfy the *procedural* unconscionability requirement, *see In re Volkswagen Timing Chain Product Liability Litigation*, No. 16-2765, 2017 WL 1902160, at *11 (D.N.J. May 8, 2017), the Complaint contains no allegations that Defendant "manipulated" the warranty terms to render them substantively unconscionable or that the time/milage limitations were "excessively disproportionate." *See Skeen*, 2014 WL 283628, at *13–14. Thus, because Plaintiffs have made no averments as to substantively unconscionable warranty terms, they cannot establish

---

[5] Plaintiffs also appear to acknowledge the deficiencies in their unconscionability arguments and request that the Court, in the alternative, allow for discovery before deciding the issue. (*See* Opp at 30 n.6.) At this juncture, the Court declines to allow for discovery on this issue, but rather Plaintiffs can seek leave to amend their complaint.

unconscionability. The Motion to Dismiss Plaintiff's Implied Warranty claim under New Jersey law (Count III) is **GRANTED**, and the claim is **DISMISSED**.[6]

### 2.    California Warranty Claim (Count VI)

Courts in this District have noted that vehicle implied warranty claims under California law require direct *vertical privity* between a consumer plaintiff and a manufacturer defendant. *E.g., Rose v. Ferrari N. Am., Inc.*, No. 21-20772, 2025 WL 815417, at *25 (D.N.J. Mar. 14, 2025) (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008)); *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 21-18755, 2023 WL 6890996, at *39 (D.N.J. Oct. 19, 2023) (citing *Clemens*, 534 F.3d at 1023). This approach is consistent with recent California district court decisions applying California law. *E.g., Quackenbush v. Am. Honda Motor Co., Inc.*, 650 F. Supp. 3d 837, 842–43 (N.D. Cal. 2023), *aff'd*, No. 24-33, 2025 WL 1009273 (9th Cir. Apr. 4, 2025); *Miller v. Ford Motor Co.*, 620 F. Supp. 3d 1045, 1064 (E.D. Cal. 2022). A buyer and a seller have direct vertical privity when they are "adjoining links [in] the distribution chain." *Clemens*, 534 F.3d at 1023. Accordingly, consumers generally in this context are not in privity with a manufacturer when they purchase from a middleman, such as a dealership. *Id.*

---

[6] As an additional basis to dismiss the New Jersey Implied Warranty claim, Defendant argues that Plaintiffs do not allege facts indicating the New Jersey Plaintiffs' vehicles were unmerchantable at the time of sale. (*See* MTD at 26–27.) Under New Jersey law, a vehicle is "merchantable" when it provides a "minimum level of quality," in other words, "safe and reliable transportation." *Greene v. BMW of N. Am.*, No. 11-4220, 2012 WL 5986457, at *3 (D.N.J. Nov. 28, 2012) (citations omitted). Courts in this District routinely dismiss implied warranty claims where Plaintiffs have been able to drive their vehicles for several years without incident. *See, e.g., Suddreth v. Mercedes-Benz, LLC*, No. 10-5130, 2011 WL 5240965, at *4 (D.N.J. Oct. 31, 2011) ("A party will not be able to raise a claim of breach of implied warranty of merchantability when they have been able to drive their vehicles for several years without issue." (citation omitted)). Here, the Defects in the New Jersey Plaintiffs' vehicles did not manifest for three years in one instance and ten years in another. (AC ¶¶ 12, 19, 25, 32.) The Court finds that more than a sufficient period of time has elapsed precluding a finding that the New Jersey vehicles were not merchantable at the time of sale. *See, e.g., Glass v. BMW of N. Am., LLC*, No. 10-5259, 2011 WL 6887721, at *1, 15 (D.N.J. Dec. 29, 2011) (finding no breach of implied warranty of merchantability where "power steering pump had melted," but "vehicle has been driven without problems for five years").

Defendant argues that since California Plaintiff Mr. Martinez purchased his vehicle at an authorized dealership rather than from FCA directly, he lacks the requisite privity with FCA to bring an implied warranty claim against FCA under California law. (MTD at 27–29.) Plaintiffs contend that to overcome the lack of privity (which they do not dispute), the Court should recognize a "third-party beneficiary exception"[7] found in a 1978 California Court of Appeals decision that allowed a property owner to sue a subcontractor under such a theory. (Opp at 34 (citing *Gilbert Fin. Corp. v. Steelform Contracting Co.*, 145 Cal. Rptr. 448, 450 (Cal. Ct. App. 1978)).) But this *Gilbert* exception "simply cannot apply here." *See Quackenbush*, 650 F. Supp. 3d at 843; *see also Valentine v. Crocs, Inc.*, No. 22-7463, 2025 WL 1675669, at *7 (N.D. Cal. May 19, 2025). In *Quackenbush*, the court explained that the *Gilbert* court restricted its own holding to the real estate context and thus the exception cannot reasonably expand to vehicle warranties. *Id.* at 843 (citing *Gilbert*, 145 Cal. Rptr. at 451) ("Maintaining the application of the exception to the real estate context is in alignment with the California authority and provides deference to California courts to define their own exceptions.") Thus, this Court follows most other courts in finding that California law has "foreclose[d] a third-party beneficiary exception to the rule of privity . . . in the consumer warranty context." *Miller*, 620 F. Supp. 3d at 1064 (quoting *Stewart v. Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 915 (E.D. Cal. 2018)); *see also McCabe v. Ford Motor Co.*, No. 23-10829, 2025 WL 953064, at *12 (D. Mass. Mar. 28, 2025) (citing decisions of the Supreme Court of California and stating "[e]xceptions to the privity requirement under California law have typically been narrow and fact-specific"). Because the California Plaintiff is not in vertical privity with Defendant and the third-party beneficiary exception does not apply

---

[7] A "third-party beneficiary exception" would permit a car owner—as a purported third-party beneficiary of the underlying agreement between the manufacturer and the dealership—to bring an implied warranty of merchantability claim.

here, the Motion to Dismiss the Implied Warranty under California law (Count VI) is **GRANTED**, and the claim is **DISMISSED**.

### 3. Illinois Warranty Claim (Count XIII)

Like California law, Illinois law requires direct vertical privity between a consumer plaintiff and a manufacturer defendant. *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) (citing *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1029–30 (Ill. 1988)). Plaintiffs do not dispute that privity is lacking; instead, they argue that Illinois's "direct relationship" exception to privity, which is triggered when a consumer has direct contact with a manufacturer, applies here.[8] (*Id.* at 35–36.) Mr. DeBruyne, the Illinois Plaintiff, allegedly bought his vehicle from a dealership rather than from FCA. (*See* AC ¶ 60.) Although Mr. DeBruyne alleges that he spoke to various sales representatives at the dealership where he purchased his vehicle, he makes no averments as to communications with FCA around the time of purchase. (*See id.* ¶ 64.)

The direct relationship exception (also known as the "direct dealings" exception) to privity "applies only where the ultimate purchaser of the product communicated *directly* with the manufacturer." *Rodriguez v. Ford Motor Co.*, 596 F. Supp. 3d 1050, 1056 (N.D. Ill. 2022) (citing *Rhodes v. Pharmacal Co. v. Continental Can Co.*, 219 N.E.2d 726 (Ill. App. Ct 1966)) (emphasis

---

[8] Plaintiffs mention in passing that Illinois law also has a third-party beneficiary exception. (*See* Opp at 33.) Illinois law does recognize this exception, but only in limited situations where "the manufacturer knew the identity, purpose and requirements of the customer and manufactured or delivered the goods specifically to meet those requirements." *Gurrola v. Ford Motor Co.*, 774 F. Supp. 3d 959, 977 (N.D. Ill. 2025) (citations omitted). In any event, the third-party beneficiary exception has no application to Mr. Debruyne's claim. *See Manley v. Hain Celestial Grp., Inc.*, 417 F. Supp. 3d 1114, 1124 (N.D. Ill. 2019) (concluding the third-party beneficiary exception does not apply because the complaint "does not allege that defendant manufactured the product to [plaintiff's] specifications but sold it to her through a middle man"). Of course, Mr. Debruyne, the sole Illinois Plaintiff, does not—and could not—allege that his Class Vehicle was configured to his specific needs because he alleges that he purchased a *pre-owned* vehicle. (AC ¶ 60.) Thus, the Court finds that Plaintiffs fail to properly allege that the third-party beneficiary exception applies to the Illinois breach of the implied warranty claim.

in original). In other words, where the end consumer and the manufacturer directly communicate, a lack of direct vertical privity is not fatal to an implied warranty claim. Therefore, to satisfy privity through the direct relationship exception, Plaintiffs must allege that the manufacturer and the ultimate customer interacted directly. *Id.*

Nevertheless, Plaintiffs argue that direct communications with FCA is not required because Mr. Debruyne had a direct relationship with "the manufacturer's retailers" *i.e.,* the dealership, who are alleged to be FCA's agents. (Opp at 36.) However, as explained in *Gurrola*, "[c]ommunicating with a Ford dealer isn't a direct dealing with Ford – it's not direct, and it's not a dealing with Ford." 774 F. Supp. 3d at 977 (citing Rodriguez, 596 F. Supp. 3d at 1056). Therefore, without any allegation that Mr. Debruyne communicated with FCA (rather than with the dealership) prior to purchasing his vehicle, the Motion to Dismiss the Illinois Implied Warranty claim (Count XIII) is **GRANTED**, and the claim is **DISMISSED**.[9]

### 4.    Ohio Warranty Claims (Counts XIX and XX)

Plaintiffs argue that direct privity is not required between the Ohio Plaintiff and FCA because FCA issued a written warranty. Plaintiffs, in a footnote, point to a Michigan district court case citing an Ohio district court for this proposition. (Opp at 33 n.11 (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 596 (E.D. Mich. 2018) (citing *Roxy Home Improvement, LLC v. Mercedes-Benz USA, LLC*, No. 17-01817, 2018 WL 1705800, at *5 (N.D. Ohio Apr. 9, 2018))).) Since this decision was issued, district courts across the country have rejected its proposition, calling it "untenable." *E.g., Browning v. Am. Honda Motor Co.*, No. 20-

---

[9] Plaintiffs baldly assert that the implied warranty's privity requirement under Illinois law is satisfied where, as here, a car manufacturer issues an express warranty. (Opp. at 32–33, 33 n.11.) However, in *Gurrola*, the court expressly repudiated that the mere existence of a warranty is sufficient to satisfy the exception. 774 F. Supp. 3d at 976. In doing so, it stated, "[i]f a buyer can get around the privity requirement for a warranty claim by pointing to the warranty itself, then the privity requirement isn't much of a requirement. Everything would go down the hatch, and the exception would swallow the rule." *Id.*

05417, 2022 WL 824106, at *7 (N.D. Cal. Mar. 18, 2022) (disapproving of *Roxy Home* and declaring "[p]laintiffs provide no authority allowing them to bootstrap a contract-based implied warranty claim onto an express written warranty under Ohio law, and the Court is not aware of any"); *Lessin v. Ford Motor Co.*, 600 F. Supp. 3d 1137, 1146 (S.D. Cal. 2022) (disagreeing with *Roxy Home* and stating "[t]he Court has found no binding authority under Ohio law that provides a standard limited warranty is equivalent to a contract for purposes of establishing privity of contact [sic]"); *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1286 (W.D. Wash. 2020) (limiting *Roxy Home*'s holding to *express* warranties). Because Plaintiffs rely on an oft-rejected holding and have failed to point to any Ohio state court decision supporting their position, the Ohio Implied Warranty claims cannot survive.[10] Thus, for the foregoing reasons, the Motion to Dismiss the Ohio Implied Warranty claims (Counts XIX and XX) is **GRANTED**, and the claims are **DISMISSED**.

### 5.    Florida Warranty Claim (Count IX)

Florida law also requires direct privity between plaintiff and defendant in order to state a claim for breach of implied warranty of merchantability. *See Ocana v. Ford Motor Co.*, 992 So. 2d 319, 325 (Fla. Dist. Ct. App. 2008) (citing *Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla.1988)). Although it is clear, as discussed above, that there is no direct vertical privity between plaintiff and defendant because no plaintiff purchased a vehicle directly from FCA, Plaintiffs advance an additional pathway to privity: third-party beneficiary exception. (*See* Opp. at 35.)

---

[10] Like Illinois, Ohio law has a third-party beneficiary exception where the alleged defective product was specifically manufactured for a particular end consumer. *See, e.g., Browning v. Am. Honda Motor Co.*, No. 20-5417, 2022 WL 824106, at *7 (N.D. Cal. Mar. 18, 2022) (applying Ohio law) (citing *Bobb Forest Prod., Inc. v. Morbark Indus., Inc.*, 783 N.E.2d 560, 576 (Ohio App. 2002)); *id.* (declining to find third-party beneficiary applied "because the car manufacturer did not know it was manufacturing a particular car for a particular Ohio customer" (citing *Rollolazo v. BMW of N. Am., LLC*, 2017 WL 1536456, at *16 (C.D. Cal. Feb. 3, 2017))). Here, the Amended Complaint contains no allegations that the 2018 Ram 1500 purchased by Mr. Weldon was manufactured by Defendant to meet his specific needs. (*See* AC ¶ 78.)

Defendant argues that no third-party beneficiary theory applies here. (MTD at 29.)

As Defendant acknowledges in its Motion, courts are split as to whether a third-party beneficiary relationship can stave off dismissal on the basis of privity under Florida law. (MTD at 29.) Defendant relies on *Valiente v. Unilever United States, Inc.* for the proposition that there is no third-party beneficiary exception to privity under Florida law. No. 22-21507, 2022 WL 18587887, at *14 (S.D. Fla. Dec. 8, 2022). Defendant fails to argue why *Valiente*, which involved antiperspirant deodorant, should be given more weight than cases more apposite involving motor vehicles. (*See* MTD at 29.) Accordingly, the Court finds decisions in the motor vehicle context more instructive. *See, e.g.*, *Weiss v. General Motors LLC*, 418 F.Supp.3d 1173, 1183 (S.D. Fla. 2019) (finding plaintiff's allegations were sufficient to show he was third-party beneficiary of contract between dealer and manufacturer); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233–34 (S.D. Fla. 2014) ("Plaintiff can pursue a claim of breach of implied warranty through third-party beneficiary law.")

In general, it is true that a plaintiff must be in privity with a defendant to recover a breach of an implied warranty claim under Florida law. *Tijerina*, 2023 WL 6890996, at *19 (citing *Cubbage v. Novartis Pharms. Corp.*, No. 16-129, 2016 WL 3595747, at *7 (M.D. Fla. July 5, 2016)). Nevertheless, a third-party beneficiary exception exists under Florida law where the plaintiff "'purchased a vehicle from an authorized dealer who was an agent of the manufacturer, the plaintiff was the intended consumer of the vehicle, the dealership was not the intended consumer, and the warranty was intended to benefit the consumer, not the dealership.'" *George v. Jaguar Land Rover N. Am. LLC*, No. 20-17561, 2021 WL 5195788, at *6 (D.N.J. Nov. 8, 2021) (quoting *Weiss*, 418 F. Supp. 3d at 1182).

Here, Plaintiffs allege that: (a) Mr. Jackson, the Florida Plaintiff, purchased his 2019 Ram 1500 Crew Cab from an authorized FCA dealership (AC ¶ 46); (b) the dealerships were agents of FCA (*id.* ¶ 250); (c) dealers are not the intended consumers of the Florida Class Vehicles (*id.*); and (d) the warranty was for the benefit of the Florida Plaintiff, not the dealership (*id.*). Therefore, consistent with other decisions in this District citing *Weiss*, such as *Tijerina* and *George*, the Court finds that, at this stage, Plaintiff's allegations sufficiently satisfy Florida's third-party beneficiary exception.[11] *See Tijerina*, 2023 WL 6890996, at *19; *George*, 2021 WL 5195788, at *6.

Beyond the third-party beneficiary argument, Defendant makes a flimsy attempt in a footnote to argue that dismissal is warranted for lack of pre-suit notice, again citing *Valiente*. (MTD at 30 n.11.) Defendant's failure to develop this argument may be viewed as a waiver of its argument for dismissal on this basis. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 368 (3d Cir. 2020) ("'[A]rguments raised in passing (such as, in a footnote), but not squarely argued,' are forfeited . . ." (quoting *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997))); *Potter v. Cozen & O'Connor*, 46 F.4th 148, 155 (3d Cir. 2022) (recognizing that a defendant bringing a motion to dismiss under rule 12(b)(6) holds the burden of persuasion that plaintiff has not stated a claim).

In any event, *Valiente* acknowledged that "courts are not in agreement as to whether the notice requirement applies to the manufacturer of a product." 2022 WL 18587887, at *16 (collecting cases). In *Valiente*, an *express* warranty claim was dismissed because notice provided through the filing of the complaint did not constitute sufficient pre-suit notice under Florida law. *Id.* at *17. However, in the context of *implied* vehicle warranties, other courts have stated that car

---

[11] If appropriate, however, after discovery and further factual development, Defendant can raise its arguments again at summary judgment or perhaps at trial.

manufacturers are not entitled to pre-suit notice under Florida law. *See Tijerina*, 2023 WL 6890996, at *20 (collecting cases). The Court finds these cases more persuasive because the text of Florida statutory section 672.607(3)(a) demands notice to "seller[s]" and it is a dealership, rather than the remote manufacturer FCA, who allegedly sold Mr. Jackson his vehicle. *See, e.g., Leon v. Honda Motor Co.*, No. 24-07872, 2025 WL 924689, at *7 (C.D. Cal. Mar. 11, 2025) (citing *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1323 (S.D. Fla. 2020)) (recognizing that Florida law does not require pre-suit notice to motor vehicle manufacturer who did not sell the vehicle directly to the consumer). Therefore, because Plaintiffs have alleged a third-party beneficiary exception under Florida law and because Defendant was not owed pre-suit notice under Florida law, Defendant's Motion to Dismiss the Florida Implied Warranty claim (Count IX) is **DENIED**.

### 6.    Michigan and Texas Warranty Claims (Counts XVI and Count XXV)

Defendant argues Plaintiffs have failed to comply with the pre-suit notice requirements under Michigan (M.C.L. § 440.2607) and Texas law (Tex. Bus. & Com. § 2.607(c)(1)). Under Michigan's "strict notice requirements," a plaintiff is obligated to provide pre-suit notice of breach to even remote manufacturers *i.e.,* a manufacturer who does not sell the vehicle directly to the consumer, before an implied warranty claim can be brought. *See, e.g., Droesser v. Ford Motor Co.*, No. 19-12365, 2023 WL 2746792, at *12 (E.D. Mich. Mar. 31, 2023) (citing *Gorman v. Am. Honda Motor Co., Inc.*, 839 N.W.2d 223, 230, 232 (Mich. Ct. App. 2013)); *accord Shaker v. Champion Petfoods USA Inc.*, 625 F. Supp. 3d 621, 630 (E.D. Mich. 2022) ("[B]uyer must provide reasonable pre-suit notice to even a remote manufacturer." (citation omitted)).[12] As the Michigan

---

[12] The Court is unpersuaded by Plaintiffs' reliance on a 2001 Southern District of Indiana case, which fails to identify a Michigan court decision addressing this issue and predated the 2013 Michigan Court of Appeals' decision in *Gorman*. (Opp at 37 (citing *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001))). For the same reason, Plaintiffs' reliance on *In re Volkswagen*, which cited *In re Bridgestone* and other authorities predating 2013 is unavailing on this issue.

Court of Appeals held, an implied warranty claim fails where "plaintiff provided neither [the manufacturer defendant] nor [the authorized dealership defendant] with any notice that she believed they were in breach until well after the vehicle's warranty had expired, and then only by filing her lawsuit." *Gorman*, 839 N.W.2d at 231. Accordingly, without any alleged notice by Mr. Clinton to FCA prior to commencing this suit, the Motion to Dismiss the Michigan Implied Warranty claim (Count XVI) is **GRANTED**, and the claim is **DISMISSED**.

Texas law closely follows Michigan law: a buyer must provide a remote manufacturer sufficient notice to sustain a breach of warranty claim. *See, e.g., Peters v. Volkswagen Grp. of Am., Inc.*, No. 21-634, 2023 WL 5436383, at *10 (Tex. App. Aug. 24, 2023) (citing *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 202 (Tex. App. 2003)); *accord McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 706 (5th Cir. 2014). Plaintiffs allege that FCA was on notice of the alleged breach of the implied warranty under Texas law through customer complaints, service requests from Class Members, the NHTSA complaint database, and FCA's own warranty claims. (AC ¶ 389.) However, this is insufficient to constitute pre-suit notice; rather "[t]he manufacturer must be made aware of a problem with a particular product purchased by a particular buyer." *U.S. Tire-Tech, Inc.*, 110 S.W.3d at 202; *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 978 (N.D. Cal. 2014) (under Texas law, "generalized knowledge of concerns are also insufficient to meet the notice requirement"); *Benkle v. Ford Motor Co.*, No. 16-1569, 2017 WL 9486154, at *15 (C.D. Cal. Dec. 22, 2017) (holding "a manufacturer has adequate notice [under Texas law] where the buyer of their product presents them with an allegedly defective component" (citing *Carroll Instrument Co. v. B.W.B. Controls, Inc.*, 677 S.W.2d 654, 657 (Tex. App. 1984))). Because there are no allegations that Ms. Legere put Defendant on notice of the alleged breach of the implied warranty, the Motion to Dismiss the Texas Implied Warranty claim (Count XXV) is **GRANTED**,

and the claim is **DISMISSED**.

### 7.    Pennsylvania Warranty Claim (Count XXIII)

Defendant's singular basis to dismiss the Pennsylvania Implied Warranty claim is the four-year statute of limitations under Section 2725(a) of the Pennsylvania Statutes and Consolidated Statutes. (MTD at 30–31 n.12; ECF No. 45 at 17 n.9); 13 Pa. Stat. and Cons. Stat. § 2725(a). Defendant argues that the Pennsylvania Implied Warranty claim is time barred because a claim for breach of an implied warranty "must be brought within four years from the date that the cause of action accrues." *Hurley v. BMW of N. Am., LLC*, 574 F. Supp. 3d 266, 270 (E.D. Pa. 2021) (citing 13 Pa. Const. Stat. § 2725(a)); *see also Rieger v. Volkswagen Grp. of Am., Inc.*, No. 21-10546, 2023 WL 3271116, at *11 (D.N.J. May 4, 2023) (noting a four-year statute of limitation applies to Pennsylvania implied warranty claims). For such claims, the statute of limitations begins to accrue at the point of delivery, even if where a breach is discovered later. *See Nationwide Ins. Co. v. Gen. Motors Corp./Chevrolet Motor Div.*, 625 A.2d 1172, 1174 (Pa. 1993). Plaintiffs argue in response that the statute of limitations is tolled under the doctrine of fraudulent concealment. (Opp at 38.)

Here, Pennsylvania Plaintiff Jacob Andress alleges he purchased a new 2020 RAM 1500 in March 2021. (AC ¶ 88.) Accordingly, the earliest the statute of limitations could lapse is March 2025. Since the Amended Complaint[13] was filed on January 28, 2025, the Pennsylvania Implied Warranty claim was brought within the four-year statute of limitations. The claim here is timely without the need to consider any tolling doctrine, and the Motion to Dismiss the Pennsylvania

---

[13] The parties do not discuss whether the Pennsylvania Implied Warranty Claim—brought for the first time in the Amended Complaint—would be treated for statute of limitations purposes as if it had been filed at the time of the original complaint. *See* Fed. R. Civ. P. 15(c) (providing that if certain conditions are met, claims in an amended complaints can be treated, for the purposes of statute of limitations, as they had been filed at the time of the original complaint). It is of no consequence here because even if the Court were to consider the filing date of the Amended Complaint as providing the operative date for statute of limitations purposes, the claim would still be timely.

Implied Warranty claim (Count XXIII) is **DENIED**.

C.     FRAUD CLAIMS (SUFFICIENCY OF FRAUD ALLEGATIONS UNDER RULE 9(B))

Plaintiffs bring 15 fraud-based claims under different legal theories all premised on Defendants' failure to disclose the Defect. These claims are brought under state statutory consumer protection laws (Counts II, IV, VII, XI, XII, XV, XVII, XVIII, XXII, and XXIV) and as common law fraudulent concealment claims (Counts VII, X, XIV, XXI, and XXVI).

Defendant raises a number of grounds to dismiss the fraud-based claims, including that they were not pled with particularity[14], that Defendant did not have a duty to disclose the Defect, that the Amended Complaint does not sufficiently set forth affirmative misrepresentations about the Class Vehicles, that the economic loss rule bars certain claims, and that Plaintiffs otherwise failed to state a claim. (*See* MTD at 31–52.)

Rule 9(b) requires that a complaint "describe the time, place, and contents of the false representations or omissions." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). Fraud by omission claims, however, face a "slightly more relaxed burden" given the inherent challenges in specifying an omission's time, place, and content. *In re U.S. Vision Data Breach Litig.*, 732 F. Supp. 3d 369, 379 (D.N.J. 2024) (internal quotation marks and citation omitted); *Carson v. HP Inc.*, 750 F. Supp. 3d 376, 393 (D. Del. 2024) (collecting cases indicating claims based on fraudulent omission have a "relaxed" pleading standard). "A plaintiff can carry his Rule 9(b) burden to plead consumer fraud by omission through allegations showing that a manufacturer knew of a defect in its product prior to the plaintiff's purchase and concealed

---

[14] The heightened pleading standard under Rule 9(b) applies to the fraud claims brought under state consumer protection statutes and state common law because federal procedural law governs in diversity cases. *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) ("[T]he pleading requirements of Rule 9(b) 'appl[y] not only to fraud actions under federal statutes, but to fraud claims based on state law.'" (citation omitted)).

it from consumers." *Bullard v. Jaguar Land Rover Auto. PLC*, No. 20-14464, 2023 WL 4845873, at *12 (D.N.J. July 28, 2023) (quoting *Yagudauev v. BMW of N. Am., LLC*, No. 20-897, 2020 WL 6689799, at *8 (D.N.J. Nov. 13, 2020)).

For much of the briefing pertaining to the fraud claims, the parties do not distinguish between the common law claims and the consumer protection claims. In many instances, they also do not differentiate between the varying state laws. Therefore, unless directly discussed by the parties or differences in state law on the relevant issues are material, the Court assumes that any such differences between the states are not relevant for purposes of the present Motion.

By way of example, the NJCFA requires a plaintiff to establish that a defendant engaged in "affirmative acts, knowing omissions, [or] regulation violations" that "caused an ascertainable loss to the plaintiff." *Coba v. Ford Motor Co.*, 932 F.3d 114, 124 (3d Cir. 2019) (citations omitted). As to common law fraudulent concealment, California's version of the law has five elements: (1) concealment or nondisclosure; "(2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Landmark Screens, LLC v. Morgan, Lewis, & Bockius, LLP*, 676 F.3d 1354, 1359 (Fed. Cir. 2012) (quoting *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004)). The other relevant state laws require essentially the same elements as the NJCFA and as California law requires for fraudulent concealment.[15]

---

[15] *E.g., Loeffler v. Target Corp.*, 324 P.3d 50, 76 (Cal. 2014) (CLRA); *DFG Grp., LLC. v. Stern*, 220 So. 3d 1236, 1238 (Fla. Dist. Ct. App. 2017) (FDUPTA); *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 459–62 (Ill. 2024) (ICFA & Illinois UDPTA); *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 517 (Mich. 2007) (MCPA); *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 996 (S.D. Ohio 2014) (Ohio CSPA); *NOCO Co. v. OJ Com., LLC*, 35 F.4th 475, 481 n.2 (6th Cir. 2022) (Ohio DTPA); *Bennnett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 151 (Pa. Super. Ct. 2012) (Pennsylvania UTPCPL); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 623 (Tex. App. 2006) (Texas DPTA); *Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1314 n.4 (M.D. Fla. 2017) (Florida fraud by concealment); *Moore v. Pendavinji*, 260 N.E.3d 111, 119–21 (Ill. App. Ct. 2024) (Illinois

## 1.    Affirmative Misstatements

Defendant argues that no affirmative misrepresentation is pled with sufficient particularity under Rule 9(b) to sustain either common law or statutory consumer fraud claims. (MTD at 40–41.) Plaintiffs identify two statements in the Amended Complaint that they contend satisfy the Rule 9(b) particularity requirements: (a) an advertisement that described the Class Vehicles "America's Longest-Lasting Pickups" (Opp at 45 (citing AC ¶ 131)), and (b) other unspecified misrepresentations about "quality, reliability, characteristics, and performance of the Class Vehicles" found in advertising and marketing materials. (*Id.* at 46.) Plaintiffs embed in the Amended Complaint a picture of a purported commercial with the phrase "America's Longest-Lasting Pickups." (AC ¶ 131.) Although seemingly from a television commercial, there are no allegations in the AC as to how or when this advertisement was disseminated.

It is widely held that statements of subjective opinions of product superiority are merely puffery and cannot form the basis of a fraud claim. *See, e.g., Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 WL 5334739, at *4 (D.N.J. Sept. 11, 2015) (collecting cases indicating "subjective opinions of product superiority [] do not rise above the level of puffery and cannot serve as the basis for a claim"). Plaintiffs rely on *Castrol Inc. v. Pennzoil Co.*, to argue that the "America's Longest-Lasting Pickups" advertisement is not a subjective opinion amounting to puffery but is rather a quantifiable representation, which *can* form the basis of a fraud claim. 987 F.2d 939, 946 (3d Cir. 1993). *Castrol*, however, involved a totally different type of claim—an intellectual property claim under the Lanham Act—and the affirmative misstatement in *Castrol* was "both specific and measurable by comparative research," making it more than mere puffery.

---

fraudulent concealment); *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 472 (Ohio 2018); *Matter of Clem*, 124 F.4th 341, 349 (5th Cir. 2024) (Texas fraud by concealment).

*See id.* Here, unlike in *Castrol*, there are no allegations as to any comparative research or testing underlying Defendant's purported misstatements. Therefore, the Court finds that Plaintiffs cannot support an affirmative misrepresentation theory of fraud based on the phrase "America's Longest-Lasting Pickups" found in Defendant's advertisement. *See, e.g., Finney v. Ford Motor Co.*, No. 17-6183, 2018 WL 2552266, at *8 (N.D. Cal. June 4, 2018) (collecting cases) (deciding that statements that a product is "best in class" are puffery and thus not actionable).

As to the remaining allegations regarding marketing and advertising materials stressing the "quality, reliability, characteristics, and performance" of the Class Vehicles, the AC states in rote fashion the following:

> Prior to purchasing the vehicle, [Plaintiff] was exposed to and viewed various online advertisements and promotional materials that touted the quality, reliability, safety, and durability of the Class Vehicles, and the Ram brand generally. [Plaintiff] relied on these advertisements when deciding to purchase the vehicle. The materials did not state the Class Vehicles suffered from any defects.

(AC ¶¶ 15, 28, 40, 49, 63, 71, 81, 90, 102.) These allegations plainly fail to establish the "what, when, and where" required to meet the 9(b) heightened pleading requirement. The Amended Complaint is devoid of any allegations as to *what* the advertisements or marketing materials misrepresented. General allegations as to misrepresentations of quality, reliability, and performance are insufficient. The AC also contains no allegations as to *when* and *where* the advertisements were published and which of these specific advertisements Plaintiffs relied on to make their purchases. *See Shamamyan v. FCA US LLC*, No. 19-5422, 2020 WL 3643481, at *8 (C.D. Cal. Apr. 1, 2020) (citing cases that dismissed fraud claims where plaintiff's allegations amounted to "unidentified representations made at unknown times"). Moreover, there are no allegations as to the contents of these unknown materials besides basic and broad categories, such as quality, reliability, durability, performance. Finally, allegations that advertisements were

disseminated "nationwide" through multiple forms of media—including print, television, internet, billboards, social media, and mail—does not provide sufficient factual details to satisfy Rule 9(b), particularly in the absence of any allegation that Plaintiffs ever viewed advertisements through a particular medium. (*See id.* ¶ 130); *see, e.g, Popejoy v. Sharp Elecs. Corp.*, No. 14-6426, 2016 WL 3381229, at *3 (D.N.J. June 9, 2016) (allegation that misrepresentations were made through a "wide array of marketing channels – namely, internet advertising, newspaper/magazine advertising, carton advertising, brochures, and other channels" is insufficient under Rule 9(b) (citing *In re Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006))). Thus, Plaintiffs have failed to plead with particularity any affirmative misrepresentations.

## 2.    Omissions: Duty to Disclose

Since Plaintiffs have not sufficiently pled any affirmative misrepresentations, their only path to a viable fraud claim is through fraud by omission. Defendant first argues that Plaintiffs' fraud by omission claims should be dismissed because Defendant had no duty to disclose the Defect.

Generally, to bring an omission-based fraud claim, a defendant must have a duty to disclose certain information. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). This theory is oft-described as "silence in the face of a duty to disclose." *Crowell v. FCA US LLC*, No. 23-13, 2024 WL 4333088, at *3 (D. Del. Sept. 27, 2024) (citing *Peters v. United States HUD*, No. 04-6057, 2006 WL 278916, *4 (D.N.J. Feb. 1, 2006)). The parties do not dispute that a duty to disclose is *sine qua non* of a fraud by omission claim; rather, they quarrel over whether Plaintiffs have sufficiently alleged that Defendant had such duty under applicable state law.[16] (*Compare*

---

[16] As with other issues raised in the briefing, the parties have not meaningfully attempted to "parse the different state standards for duty to disclose." *Carson*, 750 F. Supp. 3d at 397 (citing *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 600 (E.D. Mich. 2017)).

MTD at 37–38, *with* Opp at 43–45.)

Defendant asserts in a sweeping manner that Plaintiffs do not allege *any* type of relationship between the parties that can give rise to a duty to disclose under *any* of the state laws at issue. (*See id.* at 37, 37 n.14.) Plaintiffs do not dispute this contention, instead they argue there are three overarching doctrines whereby the Court should find Defendant had a duty to disclose under the respective state laws. (Opp at 43–45.) Plaintiffs' three theories are discussed in turn.

### a.    Partial Disclosure Theory

As Plaintiffs assert, New Jersey law and Texas law both impose a duty to disclose where "specific ambiguous partial disclosures or statements" were made. (Opp at 44–45); *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 234 (D.N.J. 2020) (internal quotation marks and citation omitted); *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019) (recognizing a partial disclosure can give rise to a duty to disclose under Texas law (citations omitted)).

Plaintiffs argue that the Amended Complaint sets forth two actionable partial disclosures, which are largely coextensive with its allegations of affirmative misrepresentations. *First*, Plaintiffs argue that Defendant's statements about the "durability and longevity" of the Class Vehicles were partial disclosures creating an additional duty to disclose. (Opp at 45.) Because the Court has already determined that these statements were insufficiently pled statements under Rule 9(b), they are similarly insufficient under a partial disclosure theory. Accordingly, without an affirmative statement that amounts to a "partial disclosure," Plaintiffs' duty to disclose theory on this premise fails. *Second*, Plaintiffs point to the dealership's representations about the "features, benefits, and attributes" of the Class Vehicles as a partial disclosure. (*See* Opp at 45 (citing AC ¶¶ 16, 29, 103).) These threadbare allegations of a partial disclosure, attributable to the dealership

and not FCA, are not pled with the requisite particularity. The AC does not specify *what* features, benefits, and attributes were discussed. Nor are allegations that conversations took place "[p]rior to purchasing the vehicle" sufficient to plead with particularity the timing of the purported partial disclosure. *See In re Rockefeller Ctr. Props.*, 311 F.3d at 220, 221 (allegations of "several weeks" before and "some time ago" are insufficient to satisfy the particularity requirements (internal quotation marks omitted)). Therefore, Plaintiffs' "partial disclosure" theory is not viable.

> b.    General Duty to Disclose Safety Defects

Plaintiffs also argue that the laws of Ohio, Texas, Illinois, New Jersey, and Pennsylvania impose a general duty to disclose safety defects. (Opp at 44.) Relying on a Southern District of Florida decision, *In re Takata Airbags Products Liability Litigation*, 462 F.Supp.3d 1304, 1320 (S.D. Fla. 2020) ("*Takata I*"), Plaintiffs argue that Ohio state law imposes a duty to disclose safety defects. (*See* Opp at 44 & n.22.) However, *Takata I* contained no discussion of whether there is a duty to disclose under Ohio law. *See* 462 F. Supp. 3d at 1317 (reiterating the duty to disclose under California, Florida, South Carolina, Alabama, and Massachusetts law, but not Ohio law). *Takata I* did not recognize an unqualified duty on manufacturers to disclose *all* safety defects under Ohio law. *See Lessin v. Ford Motor Co.*, No. 19-1082, 2021 WL 3810584, at *12 (S.D. Cal. Aug. 25, 2021) (citing cases finding no authority imposing a duty to disclose a safety defect under Ohio law); *see also Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (same). Therefore, because the only duty to disclose theory advanced under Ohio law fails, the Motion to Dismiss the fraud-based claims under Ohio law (Counts XVII, XVIII, XXI) is **GRANTED**, and the claims are **DISMISSED**.

Plaintiffs similarly argue that there is a categorial duty to disclose safety defects under Texas law. (Opp at 44 n.22 (citing *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368–70 (N.D.

Ga. 2013))). However, Plaintiffs' cited authority does not impose a blanket duty to disclose—its holding was limited to a single class of car (Mercedes Benz) and a single type of defect (gasoline tanks). *See McCabe*, 948 F. Supp. 2d at 1368–70. Indeed, Texas law does not impose a categorial duty to disclose all safety defects. Rather, "numerous cases . . . at both the motion to dismiss and summary judgment stages [have] found a manufacturer has no duty of disclosure to a consumer" without a "fiduciary or confidential relationship" between them. *Adams v. Nissan N. Am., Inc.*, 395 F. Supp. 3d 838, 849 (S.D. Tex. 2018). In Texas, a vehicle transaction between a plaintiff and a dealership does not impose a duty on a manufacturer. *Id.* at 850.

Plaintiffs have not alleged that Ms. Legere, the Texas Plaintiff, was in a fiduciary or confidential relationship with Defendant. Ms. Legere allegedly purchased her vehicle from a dealership—not directly from FCA. (*See* AC ¶ 99.) Absent a fiduciary or confidential relationship between Ms. Legere and Defendant, Defendant had no duty to disclose the Defect pursuant to Texas Law. Accordingly, the Motion to Dismiss the Texas fraud-based claims (Counts XXIV and XXVI) is **GRANTED**, and the claims are **DISMISSED.**

Plaintiffs' attempt to establish a duty to disclose safety defects under Illinois law also rests on a shaky foundation. Plaintiffs cite to *In re General Motors LLC Ignition Switch Litigation*, 257 F. Supp. 3d 372, 414 (S.D.N.Y. 2017), which cites *In re Volkswagen*, 2017 WL 1902160, *20, which in turn relies on *In re: Takata Airbag*, No. 14-24009, 2016 WL 6072406 (S.D. Fla. Oct. 14, 2016) ("*Takata II*"). Although the court in *In re General Motors*, recognized that *some* courts have imposed a duty to disclose "safety defects" under Illinois law, the court did not decide the motion to dismiss on that basis. 257 F. Supp. at 414. In *In re Volkswagen*, the court held, without analysis and citing to *Takata II*, that the defendant manufacturer had a duty to disclose the safety defect under Illinois law. 2017 WL 1902160, at *20.

At bottom, Plaintiffs' argument relies on *Takata II*, which never discussed any duty to disclose. *See O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 966 (N.D. Ill. 2021) (remarking that *Takata II* "contains no discussion or suggestion of a 'duty to disclose safety defects' under Illinois law"). Accordingly, since, Illinois law does not impose a duty on car manufacturers to disclose safety defects, the Motion to Dismiss the fraud-based claims under Illinois law (Counts XI, XII, XIV) is **GRANTED**, and the claims are **DISMISSED**.

New Jersey law similarly does not impose a general duty to disclose safety defects. *See Green v. G.M.C.*, No. A-2831-01T-5, 2003 WL 21730592, at *8 (N.J. Super. Ct. App. Div. July 10, 2003) (finding car manufacturer has "no affirmative duty to disclose" a defect to purchasers of its vehicles); *see also Stevenson v. Mazda Motor of Am., Inc.*, No. 14-5250, 2015 WL 3487756, at *9 (D.N.J. June 2, 2015) (collecting cases). As the Appellate Division reiterated, there is no affirmative duty to disclosure absent a fiduciary or "implied fiduciary" relationship or a transaction involving "special trust or confidence." 2003 WL 21730592, at *8 (citing *United Jersey Bank v. Kensey*, 704 A.2d 38, 44 (N.J. Super. Ct. App. Div. 1997)).

Here, Plaintiffs' Amended Complaint is devoid of any allegations that either New Jersey Plaintiff had placed "trust and confidence" in or had a fiduciary relationship with FCA, or even allegations that they had any direct interactions. Moreover, New Jersey courts regularly hold that circumstances similar to those alleged by Plaintiffs do not impose a duty to disclose on a remote manufacturer. *See Schechter v. Hyundai Motor Am.*, No. 18-13634, 2020 WL 1528038, at *16 (D.N.J. Mar. 31, 2020) (collecting cases finding "no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers" (citation omitted)). Therefore, because there is no *per se* rule requiring car manufacturers to disclose safety defects under New Jersey law and because Plaintiffs have not

alleged the requisite fiduciary relationship or relationship born out of a transaction involving special trust or confidence, the Motion to Dismiss the NJCFA claim (Count II) is **GRANTED**, and the claim is **DISMISSED**.

Finally, Plaintiffs point to *Zwiercan v. General Motors Corp.*, 2003 WL 1848571 (Pa. Com. Pl. Mar. 18, 2003), which they claim supports the proposition that Pennsylvania law imposes a duty to disclose defects. (Opp. at 44 n.22.) In *Zwiercan*, the court stated that "a party has a duty to disclose known material and dangerous defects, *i.e.* those defects which are likely to cause significant bodily harm." 2003 WL 1848571, at *2 (Pa. Com. Pl. Mar. 18, 2003). *Zwiercan*, while not holding that car manufacturers must disclose *all* safety defects, did conclude that manufacturers must disclose defects that have caused or are likely to cause serious bodily harm. *See Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 796 (E.D. Mich. 2019) (citing *Zwiercan*, 2003 WL 1848571, *2). Here, the Court finds that Plaintiffs have plausibly alleged a duty to disclose under the *Zwiercan* framework because the Defect has caused or is likely to cause serious harm. For example, Ms. Legere is alleged to have experienced a total loss of steering power while on the highway, almost causing an accident with an 18-wheeler truck. (AC ¶ 107.) Additionally, there are numerous NHTSA complaints involving serious injuries, including instances of: (a) power steering malfunction causing a serious crash resulting in the totaling of a vehicle (*id.* at 34); (b) sudden steering stiffening resulting in a truck clipping a parked vehicle and rolling over (*id.* at 38); and (c) steering lock resulting in a car hitting an electric power pole and the driver ending up with fractured ribs and a broken arm from the crash (*id.* at 39). The Court thus finds Plaintiffs have plausibly alleged a duty to disclose under Pennsylvania law, and Defendant's motion is **DENIED** as to Count XXII.

c.      "Superior Knowledge" Theory

Next, Plaintiffs argue that Defendant's "superior knowledge" of the Defect imposes a disclosure duty onto Defendant under the laws of Florida, California, Michigan, and Pennsylvania.[17] (Opp at 43–44.) Defendant's Reply does not address Plaintiffs' "superior knowledge" theory. (*See generally* ECF No. 45.)

The Court is persuaded that under Florida law, superior knowledge of a defect gives rise to a duty to disclose a defect. *E.g., Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1190 (11th Cir. 2025) (citing *Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. Dist. Ct. App. 1980)) (Florida law imposes a duty to disclose where one party has "superior knowledge" and the information is "not discoverable by ordinary observation" (internal quotations omitted)). The Amended Complaint's allegations of, *inter alia*, FCA's internal investigation, NHTSA consumer complaints, and recall notices indicate Defendant was clearly aware of a problem with the power steering. (*See, e.g.,* AC ¶¶ 117, 119–21.) Moreover, the Amended Complaint makes no averments that the Plaintiffs or any other operator of Class Vehicles knew of the Defect before they experienced it first-hand or that the Defect was otherwise "discoverable by ordinary observation." *Otto Candies, LLC*, 137 F.4th at 1190 (citing *Nessim*, 384 So. 2d at 1344). Therefore, the allegations taken as a whole are sufficient to allege that Defendant had superior knowledge of the Defect under Florida law.

California law imposes a duty to disclose where a defendant has "exclusive knowledge" of a material fact not known to a plaintiff. *See Rattagan v. Uber Techs., Inc.*, 553 P.3d 1213, 1238 (Cal. 2024). However, such failure to disclose cannot form the basis of a fraud claim unless there

---

[17] Because the Court finds *supra* that a duty to disclose safety defects under Pennsylvania law is sufficiently alleged, the Court need not analyze whether Defendant's "superior knowledge" could form an alternate basis for a disclosure duty under Pennsylvania law.

is "*some relationship*" between the parties. *Song Fi, Inc. v. Google, Inc.*, No. 14-5080, 2016 WL 1298999, at *7 (N.D. Cal. Apr. 4, 2016) (quoting *Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 827 (Cal. Ct. App. 2014)). As such, where a consumer purchases a vehicle from a dealership, a remote manufacturer has no duty to disclose alleged defects to the consumer. *See, e.g., Shanmugam v. Mercedes-Benz USA, LLC*, No. 20-1647, 2021 WL 2227876, at *4 (E.D. Cal. June 2, 2021) (holding that under California law, a manufacturer did not owe plaintiffs "a duty to disclose any alleged defects" because, *inter alia*, plaintiffs "admit that [the manufacturer] was not a party to the transaction of the Vehicle"). Thus, because Defendant did not have a sufficient relationship with the California Plaintiff, Mr. Martinez, who alleged purchased his vehicle from a dealership (AC ¶ 37), the Motion to Dismiss the California fraud claims (Count IV, VII) is **GRANTED**, and the claims are **DISMISSED**.

The Court is not persuaded that the "superior knowledge" theory of a duty to disclose exists under Michigan law. Plaintiffs' singular case citation under Michigan law—in a footnote without argument—is a 1998 Western District of Michigan decision recognizing a duty to disclose based on defendant's "superior knowledge." (*See* Opp at 43 n.21 (citing *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 551, 553 (W.D. Mich. 1998))). That district court case applied the "superior knowledge" standard under New York law as articulated in *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V*, a Second Circuit decision that did not involve or mention Michigan law. *See* 68 F.3d 1478, 1484 (2d Cir. 1995). *Glidden*—Defendant's sole cited authority— borrowed the *Remington* New York standard and applied it to Michigan law ostensibly because it concluded that the elements of fraud under the two laws "are substantially the same." 5 F. Supp. 2d at 551. This is too tenuous a basis for this Court to employ the New York standard under Michigan law, and Plaintiffs have not cited any Michigan state court that has applied this "superior knowledge" rule.

*See EP Henry Corp. v. Cambridge Pavers, Inc.*, No. 17-1538, 2017 WL 4948064, at *6 (D.N.J.
Oct. 31, 2017) ("Generally, it is not the province of the federal court to expand or contract the
precepts of state law that it must apply." (citation omitted)); *see also Cooper Distrib. Co. v. Amana
Refrigeration, Inc.*, 63 F.3d 262, 274 (3d Cir. 1995) (noting that a federal court is "not free to
impose our own view of what state law should be" (citation omitted)). Accordingly, since
Plaintiffs' *only* authority to support their "superior knowledge" theory is inapposite, the Motion to
Dismiss the Michigan fraud claim under the MCPA (Count XV) is **GRANTED**, and the claim is
**DISMISSED.**

### 3.    Economic Loss Rule Bars Certain Claims

Defendant moves to dismiss Plaintiffs' state-specific common law and consumer
protection claims as barred by the economic loss rule. (MTD at 41, 44.) In general, the economic
loss rule bars tort claims seeking solely economic damages. *E.g. Tiara Condo. Ass'n, Inc. v. Marsh
& McLennan Companies, Inc.*, 110 So. 3d 399, 401 (Fla. 2013); *Excavation Technologies, Inc. v.
Columbia Gas Company of Pennsylvania*, 985 A.2d 840, 841 n.3 (Pa. 2009). Plaintiffs contend
that the doctrine does not apply to fraud or misrepresentation claims. (Opp at 46, 50.) Since the
Court has already dismissed all fraud claims except for those brought under Florida and
Pennsylvania law, the Court analyzes the economic loss rule under the laws of these two states.

Under Florida law, the economic loss doctrine generally prohibits economic tort damages.
*Tiara Condo. Ass'n, Inc.*, 110 So. 3d at 401, 407. However, this doctrine does *not* bar claims for
fraud or misrepresentation. *NBIS Constr. & Transp. Ins. Servs., Inc. v. Liebherr-Am., Inc.*, 93 F.4th
1304, 1311 (11th Cir. 2024) (citing *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d
532, 537 (Fla. 2004)). "Free-standing statutory causes of action" such as claims under the
FDUPTA are similarly not precluded by the economic loss doctrine. *See Tiara Condo. Ass'n, Inc.*,

42

110 So. 3d at 406. Therefore, the Florida fraud-based claims (Count VIII and X) survive, and the Motion to Dismiss is **DENIED**.

In Pennsylvania, "[t]he general rule of law is that economic losses may not be recovered in tort (negligence) absent physical injury or property damage." *Johnson v. Toll Bros., Inc.*, 303 A.3d 471, 474–75 (Pa. Super. Ct. 2023) (citing *Spivack v. Berks Ridge Corp., Inc.*, 586 A.2d 402, 405 (Pa. Super. Ct. 1990)). Here, however, Plaintiffs only Pennsylvania fraud claim is brought under the UTPCPL. Just like Florida law, statutory claims are not barred by Pennsylvania's economic loss doctrine, and therefore Plaintiffs' Pennsylvania fraud claim (Count XXII) is not barred. *Earl v. NVR, Inc.*, 990 F.3d 310, 314 (3d Cir. 2021) ("[W]e hold that the economic loss doctrine no longer may serve as a bar to UTPCPL claims.").

### 4.    Knowledge as to the Defect

For any fraud claim to survive, a plaintiff must properly allege the defendant's knowledge of the defect at the time of the purchase. *E.g. Weiss*, 418 F. Supp. 3d at 1185 (applying Florida law); *Vullings v. Bryant Heating & Cooling Sys.*, No. 18-3317, 2019 WL 687881, at *5 (E.D. Pa. Feb. 19, 2019) (applying Pennsylvania law). Plaintiffs assert that their Amended Complaint properly establishes that Defendant knew about the Defect from "NHTSA complaints, elevated warranty claims, and FCA's inadequate attempts to remedy the defect." (Opp at 23 (citing AC ¶¶ 117–24).)

Defendant contends that these allegations are "broad and generic." (MTD at 33.) Further, Defendant argues that alleged knowledge stemming from NHTSA complaints and grievances on other third-party websites are insufficient to impute knowledge onto them. (*Id.* at 34–35.) Finally, Defendant posits that consumer complaints post-dating the sale of vehicles to Plaintiffs cannot form the basis for prior knowledge of the Defect. (*Id.* at 35–36.)

Knowledge, unlike other factual allegations that must be alleged with particularity in the fraud context, "may be alleged generally." Fed. R. Civ. P. 9(b). Therefore, allegations as to knowledge need only pass the lower pleading bar under Rules 8 and 12(b)(6). *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 103 n.15 (3d Cir. 2013) (citing *Iqbal*, 556 U.S. at 686–87); *Maugain v. FCA US LLC*, No. 22-116, 2023 WL 1796113, at *8 (D. Del. Feb. 7, 2023). An "*unusual* number" of NHTSA complaints can put a manufacturer on sufficient notice of a problem with one of their vehicles to satisfy Rule 8. *Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 435 (D. Del. 2023) (emphasis in original) (quoting *Sloan v. Gen. Motors LLC*, No. 16-07244, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017)) (collecting cases).

The Court will only examine Defendant's pre-sale knowledge vis-à-vis the fraud claims that have yet to be dismissed on a ground discussed *supra*: the Florida claims (Counts VIII and X) and the Pennsylvania claim (Count XXII).

As to Florida, with the benefit of every favorable inference afforded at the motion-to-dismiss stage, Plaintiffs have sufficiently alleged that Defendant had knowledge of the Defect when Mr. Jackson, the Florida Plaintiff, purchased his pre-owned vehicle on November 26, 2023. (*See* AC ¶ 46.) Plaintiffs allege that in 2015 and 2019, FCA issued recalls on some of the Class Vehicles after identifying "contamination" in the EPS units. (*See id.* ¶¶ 118–19, 121.) Additionally, FCA conducted an internal investigation into the Defect in August 2015 and issued a Technical Service Bulletin twelve months later. (*See, e.g. id.* ¶¶ 115–24.) Plaintiffs further allege that FCA routinely monitors NHTSA complaints (*id.* ¶ 115) and that by the start of 2023—months before Mr. Jackson purchased his vehicle—there were over 1,000 NHTSA complaints involving Ram 1500 power steering issues, and another 453 were filed by the end of the year. (*Id.* ¶ 116.) Taken together, these allegations sufficiently demonstrate that Defendant had knowledge of the Defect

before November 26, 2023. *See, e.g., Hardy v. Volkswagen Grp. of Am., Inc.*, No. 24-8251, 2025 WL 1409820, at *13 (D.N.J. May 14, 2025) ("[C]onsumer complaints are routinely accepted as supporting the inference of presale knowledge"); *see also Craft*, 2024 WL 5197080, at *4 (collecting cases indicating NHTSA complaints "may be used to show knowledge of a defect"); *see also Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-13544, 2018 WL 4144683, at *11 (D.N.J. Aug. 29, 2018) (finding allegations that "BMW NA monitored the NHTSA complaint log . . . made well before Plaintiffs purchased their vehicles" are sufficient "knowledge-related allegations").[18] Accordingly, the Motion to Dismiss the Florida fraud-based claims (Counts VIII, X) is **DENIED**.

As to Pennsylvania, Plaintiffs also sufficiently allege that Defendant had knowledge of the Defect in March 2021, at which time the Pennsylvania Plaintiff, Mr. Andress, purchased his new 2020 Ram 1500. (AC ¶ 88.) By the start of 2021, approximately 460 customer complaints had been filed with NHTSA. (*See id.* ¶ 116.) As already indicated, Plaintiffs allege that, by this point, FCA had investigated the Defect internally, issued two recalls relating to the Defect in Class Vehicles, and issued a Technical Service Bulletin relating to same. (*See id.* ¶¶ 115–24.) Accordingly, the allegations as to Defendant's knowledge of the Defect as of March 2021 is sufficient at this stage and thus the Motion to Dismiss the Pennsylvania UTPCPL claim (Count XXII) is **DENIED**.

---

[18] It is axiomatic that NHTSA consumer complaints submitted *after* a vehicle is purchased cannot establish prior knowledge of an alleged defect. *See Armstrong v. BMW of N. Am., LLC*, No. 23-3046, 2025 WL 957889, at *5 (D.N.J. Mar. 31, 2025) (citing *David v. Volkswagen Grp. of Am., Inc.*, No. 17-11301, 2018 WL 1960447, at *7 (D.N.J. April 26, 2018)). Further, in *Gotthelf*, the Third Circuit held that absent facts to support that a defendant "should have known about the defect based on these complaints," the mere filing of complaints with NHTSA is insufficient on its own to impute knowledge. 525 F. App'x at 104.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion is **DENIED** as to Counts VIII, IX, X, XXII, and XXIII.[19] Defendant's Motion to Dismiss all remaining counts is **GRANTED**. Plaintiffs, should they wish to file a Second Amended Complaint, are required to file a motion seeking leave to amend within twenty-one (21) days pursuant to Federal Rule of Civil Procedure 15(a)(2) and Local Civil Rule 15.1. An appropriate Order accompanies this Opinion.


_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**


<u>Dated</u>: August 19, 2025

---

[19] The claims that survive the Motion to Dismiss are:

On behalf of the Florida Class: COUNT VIII: FDUTPA; COUNT IX: Florida Implied Warranty Of Merchantability; and COUNT X: Fraud By Concealment under Florida law.

On behalf of the Pennsylvania Class: COUNT XXII: UTPCPL and COUNT XXIII: Pennsylvania Implied Warranty Of Merchantability.